UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

Case No. _____

| | |
|---|---|
| ALEXANDER FLINT, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ARMANINO LLP, a limited liability partnership | ) |
| ARMANINO ADVISORY LLP, a limited liability | ) |
| partnership | ) |
| | ) |
| Defendants. | ) |
| | / |

## COMPLAINT

Plaintiff Alexander Flint ("Flint") brings this action, *pro se,* against Defendants Armanino LLP ("Armanino 1") and Armanino Advisory LLP ("Armanino 2"), and states as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Flint is an individual domiciled in the State of Florida, temporarily residing in Delaware County, Pennsylvania, and is *sui juris.*

2.      Defendant Armanino 1 is an unincorporated business association with partners who are domiciled in the State of Pennsylvania. Accordingly, Defendant Armanino 1 is a citizen of the State of Pennsylvania. Defendant Armanino 1 does not have partners who are domiciled in the State of Florida.

3.      Defendant Armanino 2 is an unincorporated business association with partners who are domiciled in the State of Pennsylvania. Accordingly, Defendant Armanino 2 is a citizen of the

State of Pennsylvania. Defendant Armanino 2 does not have partners who are domiciled in the State of Florida.

4.    The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000).

5.    Subject matter jurisdiction exists pursuant to 28 U.S.C. §1332(a) over Plaintiffs' causes of action.

6.    Pursuant to 28 U.S.C. § 1391(b)(1), venue for this action properly lies in this Honorable Court.

7.    All conditions precedent to the initiation of the claims set forth in this Complaint have been performed, satisfied, excused, or waived.

### NATURE OF THE ACTION

8.    The causes of action asserted in this complaint arise from the Defendants' deceitful, reckless, and negligent conduct in the offer, sale, and provision of tax services.

9.    As set forth below, Defendants' unlawful conduct is systemic; the product of, rather than the exception to, the business model employed by Defendants - one that is now reliant on and subservient to the rotten marriage between accounting firms and private equity profiteers.

10.    Defendants operate a business model focused on achieving economies of scale, with mergers and acquisitions at the heart of their growth strategy.

11. Referring to their size and not the quality of their work, Defendants proudly claim to be a "top"[1] 20 accounting firm in the country, and in an effort to highlight just how big they are, they state as follows on their website: "We are where you are." [2]

12. "We," however, does not refer to a group of certified public accountants ("CPA's). It refers to Defendants Armanino 1 and Armanino 2, previously a single firm comprised exclusively of partners who were CPA's.

13. That changed in 2023, when Defendants accepted a significant investment from at least one (1) private equity group in exchange for an equity interest, legal and/or beneficial, in Armanino 1 and Armanino 2, a say if not outright control over Defendants' day-to-day operation and activities, and a commitment from Defendants' officers and principals to profits above all else.

14. To make room for their new and highly liquid partner while attempting to allay consumer protection concerns[3], what was previously one large accounting firm – Armanino LLP

---

[1] Merriam Webster defines "top" as "[t]he highest point, level, or part of something." Defendants know the difference between the word "largest" and the word "top," and Defendants know that consumers, including Plaintiff, do too.

[2] Defendants' representation is noteworthy. It is true that consumers want local professionals to work with. Defendants know this and built a marketing strategy around this, but that's not all Defendants know. Defendants also know that consumers, including Plaintiff, do not assume that "local" professionals will outsource our tax returns to be prepared by unqualified individuals in a third country without adequate supervision. On a related note, Defendants have two (2) offices in Pennsylvania following their acquisition of the Philadelphia-based tax firm Drucker & Scaccetti on July 1, 2022.

[3] An article published in financial times titled "**Private equity groups poised to own one in three top US accounting firms**" states as follows: "…**regulators have expressed concern about whether private equity ownership could change the 'tone at the top' of accounting firms and affect the quality of their audit work. Paul Munter, chief accountant at the US Securities and Exchange Commission, said last month that 'firm leaders need to be sensitive to the message such arrangements could send and stand ready to correct any such misimpressions'. Private equity groups have jumped into the accounting sector with enthusiasm**. New Mountain Capital's acquisition, with two co-investors, of a 60 per cent stake in Grant Thornton for $1.4bn was its second deal in the sector. Grant Thornton bosses resolved a dispute with former partners over retirement benefits and the acquisition closed last month. There was also robust appetite from

- became an "alternative practice structure" splitting into what on paper are two independently owned and governed professional-services entities: Armanino 1 and Armanino 2.

15. The Defendants, however, are separate entities on paper alone, a superficial structural change designed to allay regulators' concerns.[4] On their website – a website they share - Defendants state as follows:

> "'Armanino' is the brand name under which Armanino LLP, Armanino CPA LLP, and Armanino Advisory LLC, independently owned entities, provide professional services in **an alternative practice structure in accordance with** law, regulations, and **professional standards**. Armanino LLP and Armanino CPA LLP are licensed independent CPA firms that provide attest services, and Armanino Advisory LLC and its subsidiary entities provide tax, advisory, and business consulting services. Armanino Advisory LLC and its subsidiary entities are not licensed CPA firms."

16. It did not take very long for Defendants to make a mockery of regulators by demonstrating that they do not, contrary to their representations, provide "professional services…in accordance with…professional standards." Armed with private equity capital and burdened by the shackles of professional standards, Defendants now outsource a substantial portion of the work that consumers, including Plaintiff, hire them to perform.

17. Outsourcing allows Defendants to increase volume, and outsourcing abroad, including to individuals who are not licensed CPA's, allows Defendants to improve their margins.

---

the loan market for a $1.9bn debt sale to refinance Grant Thornton's liabilities, which priced with an interest rate 325 basis points above the Sofr benchmark, according to one person familiar with the sale. '**Private capital is penetrating the accounting profession in a way that we never thought possible,' said Allan Koltin, a deal adviser to accounting firms. 'This is getting into the bloodline of firms of all sizes**.'" https://www.ft.com/content/965e49a3-3ea7-46f2-9b74-e822788dcf72

[4] The two Defendants operate as one under the same brand name "Armanino," and partners at Defendant Armanino 2 are responsible for supervising the "independent" tax and attest services purportedly rendered by Defendant Armanino 1.

Without outsourcing, Defendants' strategy of becoming the "largest" accounting firm through mergers and acquisitions is entirely unsustainable.

18.    Outsourcing, then, has become the key for Defendants to benefit from their constant and ongoing acquisitions – acquisitions made with capital provided by their new private equity partner(s).

19.    The result is a business model in which the individual CPA's that Defendants acquire are turned into managers; managers of individuals the work has been outsourced to and managers of clients whose work has been outsourced.

20.    Defendants' business model promotes deceptive trade practices. Indeed, Defendants know that they would drive consumers and prospective consumers away if they represent that: (1) their tax returns will be prepared by an individual who is not a licensed CPA abroad; and (2) their tax return will not be reviewed by a supervising CPA before any return is filed with the IRS. Accordingly, Defendants make deceptive representations that are likely to, and do in fact, mislead consumers, including Plaintiff, and Defendants continue to: (i) deceptively market and sell professional services to consumers that are likely to have, and in the case of Plaintiff did have, serious negative consequences if not performed in accordance with professional standards and the appropriate and legally required standard of care; and (ii) deceitfully lead consumers, including Plaintiff, to believe that Defendants' CPA's will perform, or at least assume responsibility for, the work consumers pay them for.

21.    Simply put, Defendants are no longer tax or accounting firms.  They are a revenue generating toy for private equity capital; a vehicle for cash flow adorned with CPA's but driven entirely by profits. Regulators predicted this outcome. Certainly, the Defendants knew this was the inevitable outcome of their business model. When volume and margins are prioritized and there

are only so many returns that a single CPA can review before filing with the IRS, then accuracy, completeness, timeliness, and quality – all traits consumers associate with a "top" accounting firm that is "local" - will suffer.

22.     If held accountable, perhaps Defendants will one day be as proud of the quality of their work product and service as they are of their size.

**FACTUAL BACKGROUND**

*"Armanino"*

23.     Mazowian Holdings LLC ("Mazowian") is a limited liability company organized in the State of New Jersey on July 23, 2018 by Michael Alter ("Micky"), the late husband of Rivka Alter ("Rivka"), father of Dana Flint and Sharon Alter ("Sharon"), and Plaintiff Flint's father-in-law.

24.     Micky worked for over twenty (20) years in Warsaw, Poland.

25.     He organized Mazowian to hold the shares of a wholly owned Polish subsidiary ("Spunkas") which in turn owns forty percent (40%) of a Polish entity ("WNK") that owns and operates retail real estate in Warsaw, Poland.

26.     Plaintiff Mazowian currently has three (3) owners. Plaintiff Flint and Dana Flint, as joint tenants by the entireties, Rivka Alter as Trustee of the Rivka Alter Revocable Trust, and Sharon. Plaintiff Flint is Manager of Mazowian.

27.     The books and records of Spunkas and WNK are managed Piotr Grabowski ("Piotr"), a Polish citizen and resident who worked with Micky in Poland.

28.     From 2014 through 2021, the tax returns for Mazowian, Dana Flint, Rivka, and Sharon were prepared and filed by Janover LLP ("Janover"). The partner at Janover responsible for preparing and filing these returns was Barry Sunshine ("Sunshine"), a licensed CPA.

29.    Janover and Sunshine were officially acquired by "Armanino" in 2023 – shortly before Armanino accepted at least one (1) investment from a private equity fund.

30.    Chasing his big payday,[5] Sunshine, on behalf of Janover, sent an email to Janover's clients, including Mazowian, Rivka, and Sharon[6], on October 26, 2023, stating as follows:

> "Our transition to **becoming Armanino** is just around the corner on November 1st, and we could not be more excited about what this means for you. In the coming months, we will be sharing more resources and information about **Armanino** and how its extensive range of solutions will empower your success.
>
> **Armanino's client-first approach** and commitment to innovation aligns with our shared goal of driving impactful results. While we announced the combination of our firms last month, our teams have been collaborating as we prepare for the transition to bring greater innovation, expertise and solutions.
>
> We recently shared an **FAQ guide** with some important information to help you navigate this transition. Please refer to this guide or contact a member of our team with any questions or concerns.
>
> We appreciate and value your partnership and look forward to continuing to work together. We are excited about the opportunities that lie ahead for you.
>
> Sincerely,
>
> The Janover Team"

31.    The "FAQ" guide sent by Janover on October 26, 2023, states as follows:

> **"FAQs: Janover Transition to Armanino**
>
> To help ensure a smooth transition for our clients when Janover joins **Armanino** on November 1, 2023, we have put together FAQs to provide

---

[5] Sunshine claims to have retired on December 31, 2024.

[6] Plaintiff Flint saw this email and the "FAQ" section described in paragraph 30, looked up "Armanino," and, based on the representations made by Armanino on its/their website, concluded that some of the problems that had become commonplace with Janover and Sunshine would not be tolerated at a firm like "Armanino," which Plaintiff Flint believed, based on Armanino's representations, would conduct its business like big law firms; that is, they would abide by strict professional standards.

important information and updates. If you have any questions after reviewing the FAQs, please contact your Janover relationship partner.

Please be aware as we integrate our systems, responses to email and voicemail may be delayed beginning Tuesday, October 31 at 3pm EST – Wednesday, November 1 at 8am EST. During this time our team will not have access to their Janover email and phone number. Any emails sent and voicemails left during this timeframe will be received once access is restored.

**Who is Armanino?**
Armanino LLP is an industry award-winning organization and the 18th largest accounting and business consulting firm in the country. **With the addition of Janover, Armanino will nationally have 25 office locations and more than 2,500 employees located throughout the country.** Armanino closely aligns with our culture and values and expands upon the services we provide to enhance our ability to support you on your unique journey in the years ahead.

**Will my point of contact change?**
No. This combination will not affect your relationship with your service team, which will continue to be based in New York. **Decisions about your account will continue to be made locally.**

**Will my point of contact's email and phone number change?**
When Janover becomes Armanino effective November 1, 2023, emails will be changed to firstname.lastname@armanino.com, but all emails sent to Janover email addresses will be forwarded to the new address. Phone numbers will remain the same.

**What happens to my existing Engagement Letter Agreement with Janover?**
Your existing Engagement Letter Agreement with Janover will be assigned to **Armanino** for services other than attest services. If you have an attest services project or engagement that is in progress on 11/1, you will receive a bridge letter confirming the transition of your attest services engagement to **Armanino CPA LLP**.

**The same team you're working with today at Janover will continue to provide you with the same services at Armanino** under the same financial terms set forth in your existing Janover Engagement Letter Agreement. If you have any questions about your existing Engagement Letter Agreement, please contact your Janover relationship partner.[7]

---

[7] Contrary to Armanino's representations, neither the "same team" nor the "same services" were provided to Mazowian, Rivka, Sharon, Dana Flint, and/or Plaintiff.

*All clients will receive a new engagement letter for work to be performed in 2024.*

**What if I don't have a written Engagement Letter Agreement with Janover?**
If you don't have a written Engagement Letter Agreement with Janover, the same team you're working with at Janover today will continue to provide you the same services at Armanino at the same billing rates through the end of this calendar year under the following terms and conditions: http://www.armaninollp.com/professionalservices/.

If you have a project or engagement that's in progress, you may receive an Engagement Letter confirming the transition of your engagement to **Armanino or Armanino CPA LLP**. Should you have any questions or concerns regarding these terms and conditions, please contact your Janover relationship partner.

**What will happen to my files, data and information held by Janover?**
Your client files, data, and information in Janover's systems will be assigned and transferred to Armanino on November 1, 2023. If you do not want your files, data and information transferred to **Armanino**, please contact your Janover relationship partner before November 1, 2023. If you want your files, data or information deleted from Armanino's systems on or after November 1, 2023, please contact Legal.Department@armanino.com and CC your Janover relationship partner with the details of your request.

**Will my invoice terms change?**
No. Although you may receive a new engagement letter, we will honor your current billing arrangements. **We have always understood our fees are tied to the value we provide to you and our focus will continue to be on the value of service we deliver to you.**[8]

**How do I pay my invoices moving forward?**
Any invoices you receive on Janover letterhead are to be paid to Janover. Any invoices you receive on **Armanino** letterhead are to be paid to **Armanino**.

You may continue to make payments to Janover the same way you have made them in the past. Information about Armanino's payment options will be included on your Armanino invoice.

---

[8] As demonstrated in this Complaint, and contrary to Defendants' representations, "Armanino's" focus is on outsourcing and improving their margins on each tax return, not on the value of service delivered to consumers.

*Note, you may receive* invoices *from Janover, on Janover letterhead after November 1, 2023 and those should be paid to Janover.*

**What if I have prepaid amounts to Janover for services not yet performed?**
On November 1, the current balance of any amounts prepaid by you for services not yet performed (including balances on retainers) will be transferred to Armanino and credited against Armanino's performance of services for you from November 1 forward.

**Is your mailing address changing?**
No, we will still be located at:

100 Quentin Roosevelt Blvd, Suite 516
Garden City, NY 11530

and
485 Madison Avenue, 9th Floor
New York, NY 10022

**Is your website changing?**
Yes, you can find us online at armanino.com.

**Will I receive email communications from Armanino beginning Nov 1?**
Yes, you can expect to receive emails from update@armanino.com. We recommend you add this sender to your list of approved senders to ensure you receive these communications." (emphasis added).

32.    On November 1, 2023, Janover officially merged into and was acquired by Defendant Armanino 1, Sunshine became a partner at and agent of Armanino 1 and Armanino 2, and Defendant Armanino 1 assumed all of Janover's liabilities, contingent or otherwise ("Armanino's Janover/Sunshine Acquisition").

33.    Following Armanino's Janover/Sunshine Acquisition, Defendants agreed to perform the following tax services for Mazowian, Rivka, Sharon, Plaintiff, and Dana Flint for the tax year ending on December 31, 2023 ("Tax Services"): (a) timely filing of complete and accurate informational tax returns (i.e., Form 1065) for Mazowian so that Plaintiff Flint, Dana Flint, Rivka, and Sharon could attach the corresponding Schedule K-1 to their respective personal tax returns;

(b) timely filing a complete and accurate tax return for Rivka, which must include her Schedule K-1 from Mazowian's Form 1065; (c) timely filing a complete and accurate tax return for Sharon, which must include her Schedule K-1 from Mazowian's Form 1065; and (d) timely providing Plaintiff Flint and Dana Flint with a complete, accurate, and timely filed Form 1065 for Mazowian, inclusive of the applicable Schedule K-1 from Mazowian's Form 1065, so that Moises Szyller ("Moises"), Plaintiff Flint and Dana Flint's Florida-based Certified Public Accountant ("CPA"), could file the joint tax return of Plaintiff Flint and Dana Flint.

34.    On January 5, 2024, Defendants purported to enter into a purported agreement with Mazowian, Rivka, and Sharon ("Purported Agreement").

35.    The Purported Agreement states, in pertinent part, as follows:

> "**Barry Sunshine is the engagement partner and is responsible for supervising the Tax Services** and will assign work on the engagement to others at our firm, who may include CPA's and other staff and owners who are not CPA's…[w]e may use third party providers located outside of the United States to assist with the preparation of your tax return under our supervision. We may also use Armanino employees that are temporarily working outside of the United States as well as personnel from affiliates of Armanino and other Armanino-affiliated entities (including our wholly owned subsidiary based in India and contractors in the Philippines.) **Armanino[9] will review all returns before they are finalized.**" (emphasis added).

36.    The manner in which Defendants provided the Tax Services are detailed in paragraphs 54 through one hundred sixty-five (165).

37.    At all times material hereto, Defendants agreed to provide the Tax Services to Plaintiff and were aware that they were doing so.

38.    At all times material hereto, Sunshine had actual knowledge that: (a) Plaintiff Flint is married to Dana Flint and that they filed their tax returns jointly; (b) Mazowian is an

---

[9] "Armanino" is Armanino 1 and Armanino 2.

unincorporated entity treated as a pass-through entity for tax purposes; (c) Mazowian's Form-1065 is informational in nature only; (d) the Schedule K-1's included in Mazowian's Form-1065 are required to be included by Plaintiff Flint in his joint personal tax return filed with his wife; (e) Mazowian's only source of income is and has always been sourced in Poland; (f) taxes are withheld by Spunkas and paid in Poland; (g) there is a way for the majority of the taxes that are paid in Poland to be paid instead to the the United States, Sunshine said he had filed the necessary forms to be able to do so, but her never did; (h) the taxes paid in Poland are credited by the Internal Revenue Service ("IRS"); (h) Defendants were providing services to Plaintiff Flint, Dana Flint, Rivka, Mazowian, and Sharon, and all were purchasers of the services offered by Defendants for personal, family, and/or household purposes.

39.    At all times material hereto, Sunshine and Dominic Rovano ("Rovano"), Sunshine's supervisor at Armanino 1 and Armanino 2, were jointly employed by Armanino 1 and Armanino 2, and they acted on behalf of and within the scope of their employment and authority with Defendants. Accordingly, Defendants are jointly and severally liable for the acts of Sunshine and Rovano.

### *Plaintiff Flint*

40.    Plaintiff Flint and his wife, Dana Flint, were married in Florida, where Plaintiff Flint had a successful law practice. On January 2, 2022, their first child was born. In July of 2023, while Dana Flint was pregnant with their second child, Joe DiMaggio Children's Hospital in Miami informed Plaintiff Flint that their oldest child had a genetic condition so rare that they could not provide any information.

41.    Plaintiffs Flint and Dana Flint immediately decided that they would ensure that their oldest child had access to the best pediatric care, whatever the consequences. The

consequences included, but were not limited to, closing the business Plaintiff Flint spent nearly a decade building. As a result, Plaintiff Flint had to figure out how to earn a living in Pennsylvania, where he does not have a license to practice law.

42. In addition to closing his law practice, Plaintiff Flint sold the office he spent three (3) years building, and he and Plaintiff Dana turned in their cars, rented the home they spent two (2) years building, and moved to Media, Pennsylvania, to be near the Children's Hospital of Philadelphia ("CHOP"), the center where Plaintiff Flint and Dana Flint's oldest child would be going to therapy, and near the hospital where Dana Flint would give birth to their second child.

43. By the end of July 2023, Plaintiff Flint and Dana Flint had their oldest child in intensive therapy in Pennsylvania, and by September 2023, Plaintiffs Flint and Dana Flint were living in Media, Pennsylvania. Plaintiffs Flint and Dana Flint have no family or friends in Pennsylvania. They are here strictly and exclusively because, at least for now, it is best place for their oldest child to obtain the best pediatric services and quality of care available.

44. At all times material hereto, Sunshine was aware of the foregoing.

45. On or about December of 2023, once his family had a measure of stability, Plaintiff Flint began rendering legal services to clients in Florida again while looking for business opportunities that were not geographically limiting (i.e., building or acquiring an operating business) so that Plaintiff Flint and Dana Flint can move again when their oldest child is ready.

46. Real estate provided a solution, and Plaintiff Flint knew that taking advantage of any such opportunities would require that he work with lenders, who in turn would need to see copies of his and Plaintiff Dana's jointly filed tax returns in order to approve any loan. For that reason, Plaintiff Flint asked Moises to have everything ready to file his and Plaintiff Dana's joint

tax return for calendar year 2023, and on July 17, 2024, Plaintiff Flint sent Sunshine an email stating as follows:

> "Barry: Good afternoon. I hope you're well. Is the K-1 for Mazovian ready? Please advise. Thank you."

47. In August of 2024, Plaintiff Flint found an abandoned 6.5-acre estate ("Wayne Estate"), purportedly but not actually restricted to lot sizes of two (2) acres or more. The Wayne Estate was priced and purchased as if there was a legally enforceable deed restriction. There wasn't. As a result, the discrepancy between the purported deed restriction on minimum lot size and the restrictions on minimum lot size imposed by local zoning represented a tremendous amount of value. The Wayne Estate is a six (6) home development in an area where lots sell for approximately One Million Dollars ($1,000,000) and new construction homes sell for approximately $750 per sq/ft.  This represented a security blanket and very significant upside for Plaintiff Flint.

48. On August 15, 2024, Plaintiff Flint signed a contract to purchase the Wayne Estate, located at 602 Old Eagle School Rd., Wayne, PA 19087 ("Flint Wayne Estate Purchase Agreement"). As evidenced by the communications set forth in paragraphs 73 through 165 below. Defendants had every single document needed to prepare and file a complete and accurate tax return for Mazowian for calendar year 2023.

49. Promptly after executing the Flint Wayne Estate Purchase Agreement, Plaintiff Flint set out to obtain a loan, and as expected, each lender asked Plaintiff Flint for a copy of his and Dana Flint's joint 2023 tax return.

50. By the time the Flint Wayne Estate Purchase Agreement was executed, Moises had every Schedule K-1 required to be attached to Plaintiff Flint and Dana Flint's joint tax return except

for Mazowian's filed Form 1065, which Defendants - through Sunshine - agreed to provide Plaintiff Flint and Dana Flint with.

51.     As evidenced by the communications set forth in paragraphs 73 through 165 below, Defendants, through Sunshine, expressly represented to Plaintiff Flint that the Schedule K-1 he and Dana Flint needed in order to obtain a loan to purchase the Wayne Estate would be filed promptly and in any event by the deadline imposed by the IRS – September 15, 2024.

52.     Relying on Sunshine's deceptive representations, Plaintiff Flint asked Moises to be ready to file his and Plaintiff Dana's joint tax return on September 16, 2024, and informed each such lender that they would be receiving a copy of his and Dana Flint's 2023 joint tax return by September 16, 2024.

53.     At all times material hereto, Defendants, through Sunshine, had actual knowledge that Plaintiff Flint and Dana Flint were waiting for Defendants to file Mazowian's tax return for calendar year 2023 so that Moises could use the Schedule K-1 set forth therein to complete, file, and provide the aforementioned lenders for the Wayne Estate with a copy of Plaintiffs Flint and Dana Flint's joint tax return for calendar year 2023.

***Mazowian's Tax Returns***

54.     On September 15, 2024 an unidentified person filed Mazowian's Form 1065 for the tax year ending on December 31, 2023 ("Defendants' First Failed Submission").

55.     Neither Sunshine nor Rovano reviewed Defendants' First Failed Submission before it was filed.

56.     Among other things, Defendants' First Failed Submission: (a) failed to report foreign taxes paid by Mazowian; (b) reported an obscene amount of taxable income detached from reality as evidenced by all of the records provided to Defendants, through Sunshine, by Piotr.

57.    On October 2, 2024, Sunshine sent Plaintiff Flint Defendants' first amended return for Mazowian. ("Defendants' Second Failed Submission"). Defendants' Second Failed Submission was, like Defendants' First Failed Submission, inaccurate, incomplete, and improper.

58.    Neither Sunshine nor Rovano reviewed Defendants' Second Failed Submission before it was filed.

59.    The Tax Services Defendants agreed to perform were outsourced to third-parties, including to individuals abroad who are not licensed certified public accountants.

60.    Sunshine and Rovano, acting on behalf of Defendants, have continuously refused to provide Plaintiff Flint, Dana Flint, Sharon, Mazowian, Moises, and/or Rivka with the calculation Defendants used to determine Mazowian's income. In addition, Defendants ignored Sharon's numerous demands that Defendants accurately state that she is domiciled in the State of New Jersey, not the State of New York.

**_Sunshines' Retires_**

61.    On Janury 7, 2025, Rovano represented to Plaintiff Flint, Mazowian, Rivka, Sharon, Dana Flint, and Moises that Sunshine retired on December 31, 2024.

62.    Until his retirement, Rovano was Sunshine's direct supervisor both at Armanino 1 and Armanino 2. Neither Sunshine, Rovano, nor anyone else at Armanino bothered to inform Plaintiff Flint, Dana Flint, Sharon, Mazowian, or Rivka of Sunshine's retirement until after he retired, despite having promised, over and over again, that Sunshine would provide Plaintiff Flint, Dana Flint, Sharon, Mazowian, and Rivka with the calculation Defendants used to determine Mazowian's 2023 taxable income and file a complete and accurate Form 1065 on its behalf.

63.    At all times material hereto, Rovano was aware of Sunshine's representations and promises to Plaintiff Flint, Dana Flint, Sharon, Mazowian, and Rivka, and upon Sunshine's alleged

retirement, Rovano became directly responsible for the 2023 Tax Services Defendants agreed to perform.[10]

64.    Due to Defendants' unmitigated failures and refusal to cooperate in solving problems they created, Rivka, Sharon, and Mazowian changed accountants and refused to allow Defendants to file anything on their behalf.

65.    At all times material hereto, Sunshine and Rovano acted as agents of Defendants and within the scope of their employment with Defendants.

66.    As evidenced by the communications set forth in paragraphs 73 through 157 below, Rovano was and remains committed to protecting Defendants from the consequences of Sunshine's actions.[11]

67.    Ultimately, Moises filed a complete and accurate Form 1065 for Mazowian for the tax year ending on December 31, 2025.

68.    On or about June 30, 2025, Defendants send Mazowian, Rivka, and Sharon and invoice exceeding Forty-Eight Thousand Dollars and threatened to sue, or send to collections, if the invoice was unpaid by July 28, 2025.

69.    Sunshine and Rovano's hourly rates range from $685 per hour to $825 per hour, and they bill their rates for work that isn't performed by them at all.

---

[10] Defendants describe Rovano as a "thought leader" who wrote a riveting masterpiece titled **"When It's Time To Outsource."** With such impressive thoughts, it's no surprise that Defendants made Rovano a supervising CPA for other CPA's who are also not doing the work for which CPA's get hired. (emphasis added).

[11] Defendants have been perfectly content to leave Plaintiff Rivka and Plaintiff Sharon's personal 2023 return unfiled. Unbeknownst to Defendants, Plaintiffs Rivka and Sharon hired Moises as their new CPA because, as a Florida-based professional, his clients had until May of 2024 to file their 2023 returns due to the hurricanes that impacted South Florida in or around September and October of 2024.

70.     As of the filing of this complaint, Defendants continue to refuse to provide Plaintiff, Mazowian, Rivka, Sharon, Moises, and/or Dana Flint with any documentation or calculation used by them to determine Mazowian's income in tax year ending on December 31, 2023, to answer any questions.

71.     As a result of Defendants' actions, (i) Plaintiffs Flint, Dana Flint, Rivka, and Sharon were unable to file their respective personal tax returns for calendar year 2023 until 2025; (ii) institutional lenders were unwilling to provide Plaintiffs Flint and Dana Flint with a loan for the Wayne Estate; (iii) the Flint Wayne Estate Purchase Agreement was assigned to a newly created limited liability company so that Plaintiff Flint could accept investors; (iv) Plaintiff Flint spent significant amounts of time and effort raising capital at the expense of his ability to work on legal matters for paying clients.; (v) Plaintiff Flint and Plaintiff Dana Flint sold their entire bitcoin - more than three (3) – to ensure that the Wayne Estate could be acquired without a lender; and (vi) Approximately forty percent (40%) of the profits generated by the Wayne Estate will go to investors who would not own an interest in the Wayne Estate but for Defendants' deceitful conduct. Moreover, the value of bitcoin has more than doubled since Plaintiff Flint and Dana Flint sold it, thereby mitigating the damage caused by Defendants.

***Written Communications Relating to the Tax Services***

72.     On July 2, 2024, in preparation for the filing of Mazowian's 2023 return, Sunshine sent an email to Piotr requesting the documents he deemed necessary in order to complete and file Mazowian's Form 1065 by the extended deadline of October 15, 2024, stating as follows:

> "Hi Piotr-I hope you are well and enjoying the summer. We are wondering whether you have closed the books on WNK and can send them to me. Many thanks and let me know if you have any questions."

73. On July 4, 2024, Piotr responded to Sunshine's July 2, 2024 email, stating as follows:

> "Hi Barry, Happy Independent 's Day! Finanacial report for 2023 is ready. Please find enclosed:
> 1. Ordinary Shareholders Meeting approving FS 2023
> 2. Management Board Report
> 3. Supervisory Management Board
> 4. BS and PL statement for 2023 in excel file."

74. On July 6, 2024, Sunshine responded to Piotr's July 2, 2024 email, stating as follows:

> "Thank you very much for these docs and yes, had a fun July 4th holiday."

75. On July 17, 2024, Plaintiff Flint sent Sunshine an email stating as follows:

> "Barry: Good afternoon. I hope you're well. Is the K-1 for Mazovian ready? Please advise. Thank you."

76. On August 13, 2024, shortly after seeing the Flint PA Property, Plaintiff Flint began to discuss a home mortgage with Professional Mortgage Advisers ("Professional Mortgage Advisers").

77. On August 15, 2024, Plaintiff Flint received a fully executed copy of the Flint PA Home Purchase Agreement.

78. On August 16, 2024, Plaintiff Flint sent a copy of the Flint PA Home Purchase Agreement to Professional Mortgage Advisers.

79. On September 5, 2024, Plaintiff Flint, believing, with Moises, that Defendants would not possibly fail to file a complete and accurate Form 1065 by Mazowian's deadline, sent a representative of Professional Mortgage Advisers an email stating as follows:

> "Gabe: All LLC returns are due by September 15th, so my CPA just confirmed that **at worst, my personal 2023 return will be filed on September 16th**. Do you think we'll have enough time between September 16 and October 11 to get this done based on 2023? If yes, then I think you

have everything you need for now. If its not enough time, then I'll have to move forward with a significantly higher down, in which case I'd like to move that process along. Please let me know.

Also, please note that as it pertains to the rental income from Poland, the approx. 100k/yr in annual income is net of tax (there's a withholding tax paid in Poland which is credited by IRS under tax treaty on double taxation). Thank you."

80.    On September 5, 2024, the representative from Professional Mortgage Advisers responded as follows:

"Good evening Alex!

Understood on the below. **I would need to see the 2023 returns in full for everything (personal, flint, etc) to see how to proceed. Sept 16th to Oct 11th would be tight, but doable assuming there are no hiccups** uncovered during the process." (emphasis added).

81.    On September 5, 2024: Plaintiff Flint email to Sunshine stating as follows:

"Hi Barry. I hope you're well. I'm following up on email below. Is the K-1 for Mazovian ready? Please advise. Thank you."

82.    On September 6, 2024, Sharon sent an email to Sunshine stating as follows: "Hi Barry, Any idea when Alex will receive?"

83.    On September 6, 2024 Sunshine responded to Sharon's email as follows:

"**We are working on finalizing on the partnership and it should be ready shortly. We are close on finalizing it**." (emphasis added).

84.    On September 6, 2024: one of Defendants' associates who Sunshine failed to supervise, Jacob Levitin ("Jacob"), sent an email to Piotr stating as follows:

"Hi Piotr,

I am Jacob **from Armanino (Janover)** and I work with Barry Sunshine on the Mazowian account:

I am reaching out regarding the following open items on the Mazowian account, can you please send as soon as possible:

1. The 2023 Financial Statements for WNK Spolka Komandytowa
2. The 2023 Polish and US bank statements for WNK Sp. Zoo
3. Cash transaction Spreadsheet for WNK SP. Zoo"

85. To be sure, some of the items requested by Defendants on September 6, 2024, had already been requested and received by Defendants in July, and Defendants never requested any documents from Plaintiff, Mazowian, Rivka, Sharon, Dana Flint, or Piotr between July 4, 2024 – when they received the documents they requested from Piotr – and September 6, 2024, days before Mazowian's extended filing deadline that Plaintiff Alex was waiting for.

86. On September 9, 2024 – six (6) days before the filing deadline - Jacob sent an email to Piotr stating as follows:

> "Hi Piotr,Just a reminder for the email below. We need the info as soon as possible as the deadline is coming up."

87. On September 9, 2024 Piotr responded to Jacob's email, stating as follows:

> "Hi Jacob, Yes, I remember about your request. Will be in the office tomorrow and will send you required data."

88. On September 10, 2024 Piotr sent an email with the requested documents and stating as follows:

> "Hi Jacob. Please find financial statement of WNK SK per Dec. 31/ 2023 , Management report and Minutes of Shareholder Meeting.In case of any additional questions just let me know."

89. On September 10, 2024 Plaintiff Flint sent an email to Sunshine stating as follows:

> Barry: "**I have been under contract for a piece of property and closing is scheduled for October 11. My lender has been waiting for my 2023 return for over a month, and I can't get it filed without the K1 from Mazovian**. Can you please get that return filed and send us the K1's today? I don't want to have to close in cash. Thank you." (emphasis added).

90. On September 10, 2024, Sunshine responded to Plaintiff Flint, stating as follows:

"Alex – We got some more info from Piotr this morning so this should allow us to finalize the return. I will send to you the K-1 asap."

91.    On September 13, 2024: Plaintiff Flint sent an email to Sunshine stating as follows:

"Barry: Good afternoon. Has the return been filed?"

92.    On September 17, 2024, shortly after receiving the K-1 filed by Defendants to meet the applicable deadline, Plaintiff Flint – who isn't an accountant but does have a pair of eyes - sent another email to Sunshine, stating as follows:

**"Barry: Line 21 of the attached 2021 K-1 does not reflect any foreign taxes paid. Last year's K-1 reflects over 33k in foreign taxes paid. Taxes were withheld and paid in Poland in 2023 in the same manner as they were in 2022. Is there a reason why Line 21 of the 2023 K-1 does not reflect any foreign taxes being paid**?" (emphasis added).

93.    On September 17, 2024: Plaintiff Flint sent the following email to Sunshine:

**"I'm still waiting for your call. If you're too busy for this account, all you have to do is let us know. Otherwise, please do note that our collective patience is running out.  I hope you communicate with us sooner rather than later.** Thank you." (emphasis added).

94.    On September 17, 2024, Plaintiff Flint sent an email to Sunshine stating: "See attached. **I need my 2023 return filed this week, with a complete and accurate K1 from Mazowian**. Thank you." The document attached to that email was Plaintiff Flint's correspondence with Wells Fargo's home mortgage lending team in which Plaintiff Flint states as follows to a Wells Fargo home mortgage representative:

"I received the last of my K1's for 2023 last night and have already sent it to my CPA, so my 2023 return should be filed this week. I will send you a copy of the filed return as soon as I receive it, its significantly better than 2022. Thanks."

95.    On September 18, 2024: Sunshine sent an email to Plaintiff Flint stating as follows:

**"I will get you the requested info by day end.  Sorry for the delay**." (emphasis added).

96.    Sunshine did not provide Plaintiff with any "info by day end." On September 23, 2024 Plaintiff Flint responded to Sunshine's email, stating as follows:

"Barry: Will we be getting copies of the amended and filed 1065 and K1's today?"

97.    On September 30, 2024 Plaintiff Flint sent another email to Sunshine, stating as follows:

**"Barry: I don't know how else to say this. You are costing me a real estate deal**. **The lack of communication is unacceptable. Please don't make me escalate this and just send us what we need**. Thank you." (emphasis added).

98.    On September 30, 2024, Sunshine responded to Plaintiff Flint's email, stating as follows:

**"I am doing it right now. And will forward to you the K-1 by day end**." (emphasis added).

99.    On October 1, 2024, Plaintiff Flint responded to Sunshines email as follows:

"**By day end of what day**?" (emphasis added).

100.   On October 2, 2024 Sunshine sent an email attaching the Second Failed Submission to Plaintiff Flint, stating as follows:

"**Hi Alex – Enclosed is the amended schedule K-1 showing the foreign taxes**." (emphasis added).

101.   On October 8, 2024 Jacob sent an email to Sharon stating as follows:

"Hi Sharon,I am Jacob from Armanino and I work on your account with Barry Sunshine.You wrote on your tax organizer that you did not live in New York for the entire 2023. Did you live in NJ for the entire 2023 or you moved from NY to NJ during the 2023 tax year?"

102.   On October 8, 2024, Sharon responded as follows:

"Hi Jacob, **I told Barry I was living in New Jersey a couple years ago and he advised to keep the records listing NYC**. Let me know if you'd like to get on a call tomorrow to discuss."

103.    On October 10, 2024 Sharon sent an email to Sunshine stating as follows:

**"Barry, In preparation for tomorrow's 5:00 P.M. Zoom (the link for which is below), please provide me with copies of all K1's and all 1065's filed on behalf of Mazowian and its members from 2014 through 2021, including all amended versions thereof. I just spent the last hour trying to do it myself, but because you've moved firms, it's been difficult to use online portals. We can't be filing returns and paying taxes based off assumptions, especially since we did not make those same assumptions. To get to the bottom of things, we need to see the returns that have been filed from the date Mazowian was organized (December 31, 2014). Please send them to me as soon as possible and definitely before our 5:00 p.m. Zoom. Thanks in advance!"** (emphasis added).

104.    As of the filing of this action, Defendants have refused to provide Plaintiff, Dana Flint, Sharon, Rivka, and/or Mazowian  "with copies of all K1's and all 1065's filed on behalf of Mazowian and its members from 2014 through 202.

105.    On October 10, 2024, Sunshine had a Zoom meeting with Plaintiff Flint, Sharon, Dana Flint, Rivka, and Moises. Sunshine was unprepared and stated that he needed to review the filed returns.

106.    On October 14, 2024, Sharon sent an email to Jacob stating as follows:

**"Hi Jacob, I received Armanino's notice for my personal taxes. Given that Mazowian's amended 1065 needs to be amended again, I don't understand how my 1040 can be ready. On that note, I haven't been able to reach Barry. Can you or anyone else help us finalize Mazowian's return so that my return can be filed on time**?"(emphasis added).

107.    On October 14, 2024 Sunshine responded to Sharon's email as follows:

"Hi Sharon – I can speak today at 4pm – does that work **for you & Alex**?" (emphasis added).

108.    On October 14, 2024, Sharon and Plaintiff Flint had an additional Zoom meeting with Sunshine, who was, once again, unprepared, unknowledgeable, unhelpful, and late.

109.    On October 16, 2024 Plaintiff Flint sent an email to Sunshine stating as follows:

"Barry: It's October 16 and we still don't have answers to the questions raised by the information set forth in Mazowian's **amended** return. **On our last call, you told us you'd get us answers the next day, which is exactly what you told us the meeting before that. If you can't get us answers, can you please direct us to someone at your firm who can? We don't want to be a burden, but accuracy and deadlines and taxes and business**. Thanks." (emphasis added in the original) (emphasis added).

110.    On October 18, 2024, Moises sent an email to Sunshine stating as follows:

"Hi Barry, **Following up on the calculation your firm did to determine the taxable income. Please send is to us as soon as possible, we need to file the personal returns**." (emphasis added).

111.    On October 18, 2024 Sharon sent an email to Sunshine stating as follows:

"**Hi Barry,Please note that for obvious reasons Rivka and I do not authorize Armanino to prepare or file our personal tax returns**.  Please provide us with the answers and info you were seeking so that a final and accurate second amended return can be filed on behalf of Mazowian. Please get back to us by the end of the day. Thank you." (emphasis added).

112.    On October 21, 2024 Moises sent an email to Sunshine stating as follows:

"**Hi Barry, Following up again. The family is getting anxious about their 2023 filings**." (emphasis added).

113.    On October 22, 2024 Sunshine sent an email to Moises stating as follows:

"**Hi Moises – ecks!  Just saw this email.
I will answer this either tonight or tomorrow**. Best" (emphasis added).

114.    On October 24, 2024 Sharon responded to Sunshine's email and due to Sunshine's egregious lack of professionalism, addressed Jacob, stating as follows:

"How about tomorrow? Jacob, do you have this info? Who can I reach out to for a copy of previous returns?"

115.    On October 24, 2024 Plaintiff Flint sent an email to Jacob, stating as follows:

"**Mr. Levitin: Did you prepare, or assist in the preparation of, Mazowian's return? If so, please us know if we can speak to you tomorrow. If not, please provide us with the name and contact**

**information of whoever prepared Mazowian's return and the name and contact information of the managing partner at your office**. Thank you." (emphasis added).

116. Jacob never responded to Plaintiff Flint's email, and at Sunshine's direction, refused to provide Plaintiff Flint with the "name and contact information of whoever prepared Mazowian's return and the name and contact information of the managing partner at your office."

117. On October 25, 2024, Sunshine responded to Sharon's email from the day prior, stating as follows:

"I have been jammed up and will call you Sharon later on today."

118. On October 25, 2024, Sharon  responded to Sunshine, stating as follows:

"Barry,  Several people need to be on this call. Please provide us with your availability for Monday and Tuesday of next week. **In an effort for this call to be effective we need you to provide us with the calculation your firm did to determine  the taxable income,  as  we've  previously requested**." (emphasis added).

119. On October 25, 2024 (Friday) Sunshine responded as follows:

"Have a nice weekend as well. **Its most likely Tuesday**.
Have a nice weekend, Sharon" (emphasis added).

120. Barry did not provide Sharon, Plaintiff, Mazowian, Rivka, or Dana Flint with the calculation used by Defendants to determine the taxable income, as…previously requested." That's because Sunshine did not prepare Mazowian's returns. He also did not review the First Failed Submission or the Second Failed Submission before they were filed. To determine how Armanino's unqualified staff abroad came up with the numbers, Sunshine would've had to do decent work – a concept he does not understand very well.

121. On Thursday, October 31, 2024, after Sunshine once again lied in order to deceive and buy even more time, Plaintiff Flint sent an email to Sunshine stating as follows:

"Barry: **Is something the matter with you? Your work product belongs in the garbage and your service is even worse, but your disrespect for our time and effort is offensive considering that we are only expending time and effort because of your negligence and that of your team**. Let me clear: You have until the end of the day today to get us ALL of the answers for Mazowian and finish its second amended return, or in the alternative, you have until the end of the day today to send Moises **EVERYTHING** he needs to do the job correctly. If neither of those two things happen by the end of the day today, I'll do what needs to be done. If I need to go there, don't ask Rivka for favors when the going gets tough. **MY DEADLINE IS TODAY. NOT TOMORROW. NOT OCTOBER 31ST OF NEXT YEAR. NOT NEXT THURSDAY. TODAY.**" (emphasis added).

122.   Sunshine did not respond, which is why on October 25, 2024, Plaintiff Flint called his office in an effort to identify and speak to Sunshine's supervisor. Plaintiff Flint spoke to a certain Mary Jo, a member of Armanino's staff. She told Plaintiff Flint that she wouldn't know who Sunshine's supervisor is because they have over three thousand CPA's.

123.   Mary Jo was able to contact Sunshine, who asked Mary Jo to tell Plaintiff that he "swears hes going to call" Plaintiff later that day. Mary Jo then asked Plaintiff if he still wanted the contact information for Sunshine's supervisor, and Plaintiff Flint said yes.

124.   Mary Jo told Plaintiff Flint that she needed his number because "she knew that they were going to stonewall her when she asks for who is above Barry [Sunshine]." She then told Plaintiff that he "didn't hear that coming out of her mouth." Mary Jo then provided Plaintiff Flint with the name and contact information for Rovano.

125.   On October 31, 2024 Plaintiff Flint sent an email to Rovano, stating as follows:

"Mr. Rovano: Good morning. I hope you're well. Mazowian LLC is a client of Armanino's, as is the Alter family, whose members are copied hereto. Mazowian's return has been handled by Barry Sunshine and his team. **Professional malpractice are the only two words I can think of to accurately describe Barry's work. The same mistake that almost caused us to significantly overpay in 2022 (due to Barry's failure to specify the amount of foreign taxes paid) was committed again this year. This year, however, there were additional mistakes. Barry did not**

**review Mazowian's original return or its first amended return. Not before they were filed and not before any of the meetings that were necessitated by the very negligence I'm referring to. We've had an impossible time getting Barry to fix the problems he created, and whenever we manage to get a few minutes of his time, Barry is the least prepared person in the room – by far. We have repeatedly asked Barry to provide us with the calculation he used to arrive at Mazowian's net income. He has refused to provide us with that basic information. Last week, I called the Garden City office and was told that if Barry fails or refuse to do his job by the end of last week and this needed to be escalated at Armanino, that you were the person to reach out to. Please call me at your earliest convenience. 305-303-8711. Thank you**." (emphasis added).

126.    On October 31, 2024, Rovano responded to Plaintiff Flint's email, stating as

follows:

"Hi, Alexander. Thank you for reaching out. We are reviewing with the team internally and will get back to you as soon as we can."

127.    On October 31, 2024 Plaintiff Flint responded to Rovano's email as follows

"Dominic: Thank you for your prompt reply. We look forward to hearing from you."

128.    On October 31, 2024, Sunshine wrote the following email:

"Sharon – I called you to schedule a call to review the items you and Alex wish to discuss. FYI- tomorrow I am traveling most of the day but I can speak on Monday in the AM. Let me know when you can speak. Thanks."

129.    On November 1, 2024, Plaintiff Flint sent an email to Sunshine stating as follows:

"Barry: **We don't wish to discuss anything. We wish for Armanino to prepare and file a complete and accurate return – a wish your team has already had two opportunities to do. It has failed both times, despite having had every document needed to prepare a complete and accurate return for months prior to the original deadline and certainly prior to the extension deadline. If you believe that Mazowian's first amended return is accurate – something you have never told us - then surely you can agree that the most sensible course of action is for you to first send us what we have repeatedly been asking for - a calculation of how you arrived at Mazowian's net income. The proof will be in the pudding, and the pudding should be on paper so that we can review it and determine if we believe there's been an error in the calculation. On the**

other hand, if you agree that Mazowian's first amended return is inaccurate, then surely you can agree that the most sensible course of action is for you to send us a draft of what you believe to be a final, complete, and accurate second amended return so that we can review it and ask any questions prior to filing. A call to discuss things will only be useful after you do some real work for Mazowian. The call is not the work. The call is client management, and we are done being managed. We will not follow this pattern of setting up calls only to conclude that we need to set up additional calls to allow you additional time to "look into" things, followed by a weeks-long chase for another fruitless call. To that end, the fact that you are asking for a call in response to yesterday's correspondence is telling. Had you already "looked into" things – the thing you said you were going to do at the conclusions of our last 3 calls -  you could have just told us that the first amended return is accurate or alternatively explained where a mistake was made, how you were going to fix it, and when you were going to fix it. But you want a call.  To be clear, 3 different individuals, all of whom live in different states and work, have, over a period of months, made numerous efforts, and exercised tremendous patience, in order to accommodate the one person who should be accommodating us. After all, Mazowian is the client, and Mazowian didn't screw up its own return twice. I sincerely have no idea where you got the notion that your time was more valuable than my time, Sharon's time, or Moises's time, and I certainly don't understand why you think that being a busy CPA excuses your failure to do the CPA work for which Mazowian hired you. The one thing I do understand is that I had to raise millions of dollars from investors, and take on private loans, due to my inability to present institutional lenders with a copy of my 2023 return. Please provide us with the calculation you used to arrive at Mazowian's net income as reflected in the first amended return. In addition, if you believe the first amended return is accurate, please declare as much. Alternatively, if you believe that the first amended return is in fact incomplete and/or inaccurate, please send us a draft of what you believe to be a final, complete, and accurate second amended return, together with the calculation used, so that we can review it and ask any questions prior to filing. We can schedule a call afterwards. Finally, please note that, on behalf of Mazowian, this email shall serve as a formal demand that Armanino not contact anyone in Poland on Mazowian's behalf without Sharon's prior written authorization. That includes Jacob." (emphasis added).

130.    On November 5, 2024: Sunshine, **admitting that he had never reviewed the material used to prepare Mazowian's original 2023 return and its amended 2023 return**, responded to Plaintiff Alex's email, stating as follows:

"Alex, I will reviewing all the materials and provide to you the amended tax return along with all the support necessary to finalize this matter. **FYI- I am attending our partner rally until Thursday**. So I will provide this information to you on Friday – November 8th.Best Barry"

131. On November 12, 2024, Plaintiff Flint sent an email to Sunshine and Rovano, stating as follows:

" "Barry: Today is November 12th. See your email below.

**Dominic: By now, you are clearly aware of the problem. We were told that you were the person to fix this. If you are not, please direct our attention to whoever is**. <u>**Time is of the essence**</u>. Please advise. Thank you." (emphasis added) (emphasis in the original).

132. On November 13, 2024, Rovano sent Plaintiffs an email stating as follows:

"Good morning. **I spoke to Barry, and he has assured me that the return will be in your hands no later than Friday. We are having our international tax lead review the international components and that is being finalized right now.** Please let me know if you have any questions. Dominic." (emphasis added) ("Rovano Supervision Email").

133. On November 15, 2024, Sunshine sent Sharon, Dana, and Rivka an email stating as follows:

"Hi Sharon, Dana & Rivka –Enclosed is the updated tax return. I will be processing the return for assembly on Monday. In the meantime, should you have any questions then please let me know. Best, Barry"

134. This second amended return was still inaccurate and improper.[12]

135. On November 21, 2024, Moises sent an email to Sunshine stating as follows:

"Hi Barry, A couple of questions:
-        On the form 5471, the subpart F income is almost 500K but on Schedule  K, its only about 116K, why is there a difference?
-        I believe that box E on the 5471 should be checked
-        I don't see Schedules J, P, Q or R on the 5471
-On Schedule K-2, Section 4, the foreign taxes are in the US column, should this be on the Foreign Passive category?

---

[12] No one authorized Defendants to file the first or second amended return. Defendants filed the second amended return anyways.

Are you free this afternoon or tomorrow at any time for a call to discuss?
Best,
Moises"

136.    On November 27, 2024, Sunshine agreed to speak to Moises over the phone.

Promptly after their call, Moises sent an email to Sunshine stating as follows:

"Hi Barry,

Thanks for your time today. As discussed please send us the reconciliation of the distribution from the Polish entity to the US LLC as well as the reconciliation of the Subpart F income on the 5471 to the income on the schedule K.

Best,

Moises"

137.    On December 6, 202, Moises sent an email to Sunshine stating as follows:

"Hi Barry, Just following up on the information requested below. Best, Moises."

138.    Sunshine did not provide Moises with the requested materials.

139.    On December 7, 2024, Plaintiff Flint sent an email to Rovano stating as follows:

"Dominic: Good morning. I hope you're well. **On November 13 at 12:32 p.m., you sent an email stating, in pertinent part, as follows: "We are having our international tax lead review the international components and that is being finalized right now. Please let me know if you have any questions." Can you please provide me with the name and contact information for the international tax lead? Thank you**." (emphasis added).

140.    Rovano refused to provide Plaintiff with the name and contact information requested.

141.    On December 9, 2024, and presumably in response to Plaintiff Flint's email to Rovano, Sunshine sent Plaintiff Flint an email stating as follows:

"HI Alex – I had a call last week with Moises and told him that we would make some updates and once done we will send him the updates along with the supporting documents. **We should be complete midweek and after your receipt of the updated materials and you still have any questions, then please let us know**. Thanks. Barry." (emphasis added).

142. On December 9, 2024, Plaintiff Flint responded to Sunshine's email, addressing both Sunshine and Rovano, stating as

"Barry: **Considering that the return should have been complete and accurate months ago when it was due and when I told you I needed it for a very important real estate transaction, it is genuinely unbelievable that the last version of the return – the one that was reviewed by the international tax lead at Armanino before it was sent to us – still needs "some updates." Were you missing information before you sent us the return you are now updating again? Why didn't you ensure that the return was completely "updated" before you sent it to us? It definitely wasn't because you were trying to meet a deadline. As you can see, I have plenty of questions for you, with or without your newest updates, but I'll be asking them when I consider it appropriate to do so. In the meantime, you can keep attempting to put together a complete and accurate return while everyone else at Armanino watches this train wreck without interfering. To that end, I note with interest that on its website, Armanino states as follows: "As a top 25 accounting and consulting firm in the nation, Armanino delivers a depth of knowledge, a range of services, and a consistent and responsive team." Where is this depth of knowledge? Where is this consistent and responsive team**?

**Dominic: Please provide me with the name and contact information of the International tax lead who reviewed the return that, as indicated by Barry, still needs updating despite the fact that it was deemed sufficiently complete to send to us. Thank you**." (emphasis added).

143. Once again, Rovano refused to provide Plaintiff with the name and contact information requested.

144. On December 11, 2024, Moises sent another email to Sunshine, stating as follows:

"Hi Barry,
Do you have any update on the information?
Best,
Moises"

145. On December 11, 2024, Sunshine responded to Moises's email, falsely stating as follows:

"Will send it to the group by day end."

146. He did not. On December 13, 2024, Moises sent the following email response to Sunshine:

"**Barry**?" (emphasis added).

147. On December 19, 2024, Plaintiff Flint, responding to Rovano Supervision Email from November 13, 2024, sent an email to Rovano stating as follows

**"Are you still supervising Barry? His silence would ordinarily indicate that he's been fired for cause, but your silence in the face of Barry's conduct, combined with your refusal to provide me with the name and contact information of the international tax lead, is indicative of something far worse than one bad apple. Please let me know who at Armanino I can speak to in order to resolve this matter**. Thank you.  (emphasis added).

148. Rovano did not respond to Plaintiff Flint.

149. On December 24, 2024, Moises sent the following email to Sunshine:

"Barry,

**Please send me the information we discussed almost a month ago**.

Best,

Moises" (emphasis added).

150. Sunshine did not send Moises the requested information. Instead, on January 7, 2025, Rovano sent the following email to Moises, stating as follows:

"Hi, Moises.

I hope all is well.

**Barry has retired from the firm effective December 31, 2024. I'm reaching out to see if you received the information that you are looking for. If not, please let me know and we will arrange for your questions to be answered ASAP**.

Dominic" (emphasis added).

151.    On January 9, 2025, Moises sent the following email to Rovano:

"Hi Dominic,

Happy new year to you and your family. Thank you for reaching out, as **I never received anything from Barry regarding the information requested**.

**In particular, I need to understand his calculation of the subpart F income on Form 5471 and how it tracks back to the subpart F income on Schedule K. Barry informed me that there was an overreporting of income in the prior years and that they were going to true is down in 2023 but never provided his calculation how they went from approximately $500K in subpart F income in 2023 on Form 5471 to approximately $116K of subpart F income on the 2023 Schedule K. We need to understand where the miscalculation occurred in the prior year.**

Thank you for your help with this.

Best,

Moises" (emphasis added).

152.    On January 10, 2025, Rovano responded to Moises via email as follows:

"Hi, Moises. Thanks for the information. I will look into this and circle back with you next week.

Dominic"

153.    On January 28, 2025, Moises sent the following email to Rovano:

"Hi Dominic,

Just wanted to follow up.

Best,

Moises"

154.   On January 29, 2025, Rovano responded to Moises, stating as follows:

"Hi, Moises. Apologies for the delay. **The team is making edits and we will get you an updated forms and answers** in the coming days.

Dominic"[13]

155.   On January 30, 2025, Plaintiff Flint responded to Rovano's email as follows:

"**That's totally fine, its only a year late. Take your time. Taxes are not as important as pleasing your private equity partners. We'll continue waiting, let us know if your team needs a couple more years**.

**As previously requested on numerous occasions, please provide me with the name and contact information of the "international tax lead" you indicated had reviewed the last version of the tax return that your team deemed ready to send to us and file but is now making edits to**. Thanks." (emphasis added).

156.   Rovano did not provide Plaintiff with the name and contact information requested.

157.   On February 12, 2025, Moises sent an email to Rovano stating as follows:

"Hi Dominic,

An update on the information below? We need to file the member's returns asap.
Best,

Moises"

158.   On February 12, 2025, Rovano sent an email to Moises stating as follows:

Hi, Moises.

We would like to set up a call to review some of the changes to the form. @Ken Harvey, who leads our international team, will be joining us on the call. Can you please let me know what works for you later this week/early next week?

Best,

Dominic"

---

[13] This is nearly a year after Defendants should have filed a complete and accurate return.

159.    Moises and Rovano scheduled a zoom call for February 21, 2025 at 11 a.m.

160.    On February 21, 2025, Rovano cancelled the meeting, stating as follows:

"Good morning. Unfortunately, we had a conflict come up and would like to push this meeting to Monday or Tuesday. @Cristina Banek can help to coordinate a new time. Apologies for the last minute change.

Thank you!"

161.    On February 24, 2025, Moises sent an email to Rovano stating as follows:

Hello Dominic,
I wanted to follow up and see when we can reschedule.
Best,
Moises"

162.    Moises and Rovano had a zoom call on February 28, 2025. Like Sunshine, Rovano was unprepared and useless.

163.    Ultimately, Moises filed a complete and accurate Form 1065 for Mazowian for the tax year ending on December 31, 2025.

164.    As of the filing of this complaint, Defendants have refuse to provide Plaintiff Flint, Dana Flint, Rivka, Sharon, and/or Mazowian with the information requested – information that would detail the scope and magnitude of Defendants' negligence, recklessness, and deceit.

***Defendants' Deceitful Billing Methods***

165.    In a flagrantly deceptive practice, the Purported Agreement attempts to provide Defendants with as many billing options as possible, stating as follows: "Our fee for the Services will be based on the complexity of services, value delivered, and our hourly rates."

166.    The Purported Agreement is so misleading that it fails to set forth essential terms, a necessary condition to the existence and validity of an agreement. Indeed, it is unclear how fees can be based on hourly rates, value delivered, and the complexity of services at the same time. For

example, the fee could include the aggregate hourly rates plus the value delivered plus the complexity of the services, or it could be some other fascinating formula. Equally unclear is which party determines the value delivered and the complexity of services. Common sense and capitalism both dictate that the recipient of a service – consumers - should determine its value.[14] Either way, to ascertain how Defendants bill for services, one can only guess.

167.    In addition, as stated above, Defendants are dishonest about the number of hours billed and who billed them, and because of their business model, Defendants are incentivized to complicate simple tasks by, for example, giving it to an individual unequipped to perform it, in the Philippines or elsewhere.

168.    On or about June 30, 2025, Defendants send Mazowian, Rivka, and Sharon and invoice exceeding Forty-Eight Thousand Dollars and threatened to sue, or send to collections, if the invoice was unpaid by July 28, 2025.

169.    Notably, the Purported Agreement states as follows: "Any additional professional services not specifically described in the scope of Services above, such as any amended returns…we anticipate that there will be out-of-scope services for this engagement."

170.    Stated differently, Defendants have an interest in doing everything wrong so that they have to try to do it right, over and over again. This way, Defendants can charge nearly Fifty Thousand Dollars ($50,000) for a service that should be timely provided and cost $1,800. The reckless work is performed by non-CPA's in a third-world country for peanuts, and then Defendants charge an obscenity in a failed attempt to fix what they themselves did.

---

[14] If Defendants' fee is a function of the value delivered, then their fee must be zero dollars with zero cents ($0.00).

171.    At no point did Defendants communicate that they were performing out-of-scope services, as required by the Purported Agreement.

172.    Defendants' fee structure is deceitful, and they use it to deceive. When convenient, they bill per hour, and if hourly work is no convenient, then they bill based on the "value delivered" or the "complexity of services." Presumably, they decide how complex a service is and how much value was delivered. They are even worse at assessing value than they are at being certified public accountants.

### *Rivka's Pension Plan and IRS Notice of Deficiency*

173.    In 2014, Micky and Rivka, through Sunshine, set up a pension plan of which Rivka became the beneficiary. The plan was administered by Maddison Pension.

174.    The head of Maddison Pension is David Gensler.

175.    David Gensler did not communicate with Rivka directly. Sunshine instead positioned himself as the intermediary, a common practice for professionals seeking to enshrine their value.

176.    Indeed, from the time of Micky's passing, Rivka – a woman who is over eighty (80) years old - has relied on Sunshine to handle all paperwork related to taxation, the pension plan, and incidental obligations.

177.    She regularly visited Sunshine at his office, concerned that she was not in compliance with her tax obligations. She would regularly bring with her folders with documents for Sunshine to review and let her know if she had any unpaid obligations and to advise her of what to do.

178.    Shortly after Micky's passing, David Gensler advised Sunshine that Rivka should terminate the pension plan.

179.    Pension plans require that Form 5500 be filed. As set forth in the emails below, Sunshine failed to do so while simultaneously assuring Mr. Gensler and Rivka that he was on top of everything.

180.    Sunshine always told Plaintiff Rivka not to worry, to leave all the documents with him and that he would take care of it.

181.    On March 10, 2025, Rivka received a Notice of Deficiency from the IRS claiming that she owed Forty-Eight Thousand Seventy-Five Dollars and Sixty-Four Cents ($48,075.64) for calendar year 2019.

182.    Plaintiff has since contacted Mr. Gensler's office to ascertain if the source of this alleged deficiency lies in Sunshine's failure to report income from the pension plan.

183.    Among other things Plaintiff discovered are the following emails:

a.    On October 21, 2020, David Gensler sent Sunshine an email stating as follows:

"Hi Barry – It is my understanding that with Michael having passed away, we should terminate the plan.  The following fees will need to be paid:

**A)**    For prior administrative, actuarial and consulting services:  $6,786.  Note that some of the these services relate back to the 2018 plan year.  If our client acts quickly, there is still a chance to make 2020 the final plan year.  **It can only be the final plan year however, if we are retained immediately and the client sends back to us all of the signed paperwork and a check ASAP.**
B)    For the plan termination, the fee will be $2,250.  As a result of the close relationship between our firms, we have materially reduced our fee to terminate the plan.  It was previously in excess of $4,000.

This email contains the following attachments:

1)    The service agreement to terminate the plan.  This document should be signed by you or the client (preferably the client) and retuned to us along with the client's check for $9,036.  If the client prefers, the plan can pay these fees.  We also now  accept credit cards.
2)    The plan amendment freezing benefit accruals.  This form is tobe signed by the client and returned to us.  The effective date of the plan termination is October 31, 2020.

3)      The adopting resolution freezing the plan.  Insert a current date where indicated and then have the client sign and date the form at the bottom of the page.
4)      The Notice of Intent to Terminate (NOIT).  This form is to be retained by our client's beneficiary which is presumably his wife.

Do not hesitate to call me if you have any questions."

    b.  On November 3, 2020, Sunshine sent David Gensler an email stating as follows:

"Hi David,
I have been jammed on a lot of calls this week.
I will reach out to you and I am not avoiding your calls.
I promise that I will call you when I have  a chance.
Best
Barry"

    c.  On December 7, 2020, David Gensler sent Sunshine an email stating, in pertinent part, as follows:

"Hi Barry - We really need to talk. Time keeps marching on. **It is now too late to complete the plan termination in 2020**. **The plan is still active, the plan has not been terminated, fees keep accruing and truly, I am not sure what to do. The plan can pay our fees but that assumes the client is willing to do that. My sense is that the client will follow your direction about what to do.**
How can we get this done?" (emphasis added).

    d.  On December 9 2020, David Gensler sent an email to his staff concerning Sunshine, stating as follows:

"Hi Kristine – Thanks for your thoughts on this.  Here is what I have done and/or tried to do.
David,
•      Have you tried to call him?  I've seen a lot of emails just curious maybe he is better via phone.  I have tried to call him multiple times, both at the office and on his cell phone.  When I call him in the office, I am told he is "on the phone" and will "call me back," which never happens.  When I call him on his cell phone, he recognizes my number and lets the call go to voice mail.
•      Does he have an assistant in which you can set up a scheduled call?  No, you just get the receptionist (good idea though).
•      Do you have his cell, can you send him a text?  I have done that (and will continue to do that).  **Sometime he responds that he is "very busy" but will call me "soon."  Soon never happens though**.

- Since he isn't responding to you, have someone else reach out to him. I can try if we go over what exactly you need/trying to accomplish. That is a good idea. He does not know you and will probably take your call. **Once he knows what you are calling about though, he will invariably say that he is "in a meeting" and he will call you right back. That of course never happens.** No harm in trying though. His cell is (516) 659-3461.
- Does Bobby have a relationship with him, maybe he can try? He would not know Bobby if he tripped over him.
- **If none of the above work and we still get nowhere, I'd send a certified letter to him and the client so that they can't come back to us and say we never told them. I know we don't want to ruin the relationship but to me, what kind of relationship is it if we can't reach him/he ignores us. Good point. If you make no headway, that is what I will do. Since the client that we were dealing with passed away, I am not sure if we even have an address for the client. I believe everything goes through Barry**.

We need to follow up with him, but not be annoying with a ton of emails if he isn't someone that likes emails so I'm just trying to think of non-email ideas." (emphasis added).

e.  On August 9, 2021, David Gensler sent Sunshine an email stating, in pertinent part,

as follows:

"Barry, I have been extremely patient while I am waiting for you to meet with Rivka about terminating the plan and getting us paid. My patience however, is at an end. We placed her Form 5500 on extension to October 15th. I am instructing the consultant on this plan to do no further work until this gets resolved. Note that in 2019, the IRS increased the last filing penalty for Form 5500 from $25 per day, maximum of $15,000 to $250 per day, maximum $150,000. These penalties rarely get waived unless true cause can be shown. There is no "true cause" here that I can see. Lori Ann, until I say it is OK, do not do any father work on this client. "

f.  On August 19, 2021, David Gensler sent Sunshine an email stating as follows:

"Barry – As stated in an earlier communication to you, until this client gets current on their outstanding bills, pays us for the plan termination and the consulting and administrative work for the (final) 2021 plan year* no further work will be done for them. As I also communicated to you, the IRS recently raised their penalty for late filed Form 5500's *by a factor of ten* (from $25 per day, maximum $15,000 to $250 per day, maximum $150,000).
*that's assuming we can get the plan termination done and the assets rolled out by the end of the year*

Since I am unsure as to how much our client does or does not know about all of this, if we cannot resolve this by a week from tomorrow (Friday, August 27th) I will be sending Rivka a letter or an email detailing all of this so that she is not in the dark.

**You were going to meet with Rivka about this and other matters**. Did that happen?  If not, when will this happen?

We absolutely must resolve this.  There is still time to terminate the plan, file the 2020 Form 5500 and then file a final 2021 Form 5500.  Time however, is quickly running out.  "

g.  On September 22, 2021, David Gensler sent Sunshine an email stating, in pertinent part, as follows:

"The 2020 Form 5500 is due to be filed no later than 10/15/2021.  That is only three weeks away.  I have instructed Loriann Joseph, the consultant on your plan not to prepare Form 5500 until we are paid.  I have called and emailed numerous times but to date, **you have not called me back or responded to my emails**... The IRS recently increased its late filing penalties **by a factor of 10**.  So while the IRS used to bill the plan sponsor (that would be Rivka) late filing penalties of $25 per day, maximum $15,000, about six months ago **they raised it to $250 per day, maximum of $150,000**… Once those penalty letters from the IRS start showing up (and believe me, they will) I am not entirely sure how you will be able to explain any of this to Rivka."

h.  On September 10, 2021, David Gensler sent Sunshine an email stating, in pertinent part, as follows:

"Barry – The clock is ticking.  Do you want to talk? "

i.  On November 18, 2021, David Gensler sent an email to his staff concerning Sunshine, stating as follows:

"He always says that.  He always claims that we are close to resolving this.  But it never actually get resolved. "

j.  On December 8, 2021, David Gensler sent an email to his staff stating as follows about Sunshine:

"He is very good at promising to "take care of things" but he never actually does. I will give myself a reminder to send out one more letter before the end of December. At that point, I have no qualms about putting the open invoices in for collection. This has gone on long enough."

k. On April 4, 2022, David Gensler sent an email to his staff stating as follows:

"Barry Sunshine is the accountant. He is very good at promising to help us get paid. Much less so, in actually facilitating the payment. **In fact, I am convinced that he is the reason that we have not yet been paid. So I have every expectation that nothing will happen because of him on April 15th, April 16th or at any time in the future**. "

184. As a result of Sunshine's negligence, Rivka suffered damages.

185. At all times material hereto, Sunshine acted as an agent of and within the scope of his employment with Janover.

186. When Defendants acquired Janover and Sunshine, Defendants assumed their liabilities. Accordingly, Defendants are liable for the acts of Sunshine and Janover.

187. Rivka, Dana Flint, Sharon, and Mazowian have assigned their claims against Defendants to Plaintiff Flint.

<u>COUNT I</u>
**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-2(4)(xxi).**
**(Against Armanino 1 and Armanino 2)**

188. Plaintiff re-alleges and incorporates paragraphs one (1) through one hundred seventy-one (171) above as if fully set forth herein.

189. This Count I is brought against Defendants, jointly and severally, pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, which makes it unlawful to engage in any deceptive conduct which creates a likelihood of confusion or of misunderstanding.

190. Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian purchased services from Defendants primarily for a personal, family, or household purpose.

191.    Defendants engaged in deceptive acts and practices, meaning conduct that is likely to deceive a consumer acting reasonable under similar circumstances.

192.    The deceptive act or practice occurred in the conduct of trade or commerce.

193.    Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian justifiably relied upon the unfair and deceptive conduct.

194.    As a result of the use and employment by Defendants of methods, acts, or practices declared unlawful by 73 P.S. § 201-2(4)(xxi), Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian suffered an ascertainable loss of money or property.

WHEREFORE, Plaintiffs respectfully requests the entry of a final judgment in their favor and against Defendants, jointly and severally, for actual damages plus treble damages, attorneys' fees and costs, pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional relief that this Honorable Court deems just, equitable, and proper.

## COUNT II
### Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law
### 73 P.S. § 201-2(4)(vii).
### (Against Armanino 1 and Armanino 2)

195.    Plaintiff re-alleges and incorporates paragraphs one (1) through one hundred seventy-one (171)  above as if fully set forth herein.

196.    Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian purchased services from Defendants primarily for a personal, family, or household purpose.

197.    The Defendants engaged in representing that their services are of a particular standard, quality, or grade, when they are actually of a different standard, quality, or grade.

198.    The deceptive act or practice occurred in the conduct of trade or commerce.

199.    Plaintiff, Dana Flint, Rivka, and Sharon justifiably relied on the Defendants' false representation or conduct.

200.     As a result of the use and employment by Defendants of methods, acts, or practices declared unlawful by 73 P.S. § 201-2(4)(vii), Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian suffered an ascertainable loss of money or property.

WHEREFORE, Plaintiffs respectfully requests the entry of a final judgment in their favor and against Defendants, jointly and severally, for actual damages plus treble damages, attorneys' fees and costs, pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional relief that this Honorable Court deems just, equitable, and proper.

**COUNT III**
**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-2(4)(ix).**
**(Against Armanino 1 and Armanino 2)**

201.     Plaintiff re-alleges and incorporates paragraphs one (1) through one hundred seventy-one (171)  as if fully set forth herein.

202.     Plaintiff, Dana Flint, Rivka, and Sharon purchased services from Defendants for personal, family, or household purposes.

203.     The Defendants engaged in conduct that falls under the definition of 73 P.S. § 201-2(4)(ix). Defendants misrepresented the characteristics, sponsorship, or nature of their services.

204.     The deceptive act or practice occurred in the conduct of trade or commerce.

205.     Plaintiff, Dana Flint, Rivka, and Sharon justifiably relied on the Defendants' false representation or conduct when making their decision to purchase the services.

206.     As a result of the use and employment by Defendants of methods, acts, or practices declared unlawful by 73 P.S. § 201-2(4)(ix), Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian suffered an ascertainable loss of money or property.

WHEREFORE, Plaintiffs respectfully requests the entry of a final judgment in their favor and against Defendants, jointly and severally, for actual damages plus treble damages, attorneys'

fees and costs, pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional relief that this Honorable Court deems just, equitable, and proper.

**COUNT IV**
**Negligence**
**(Against Armanino 1 and Armanino 2)**

207.    Plaintiff re-alleges and incorporates paragraphs one (1) through one hundred seventy-one (171)  as if fully set forth herein.

208.    At all times material hereto, Defendants owed Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian a reasonable duty of care in rendering Tax Services.

209.    Defendants breached the duty of care owed to Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian by: (1) outsourcing the Tax Services to individuals who are unqualified to perform the Tax Services; (2) failing to have Sunshine – the only person at Armanino familiar with Mazowian's business - review Defendants' First Failed Submission and Defendants' Second Failed Submission prior to filing same with the IRS; and (3) failing to advise Rivka that she should terminate the pension plan; (4) failing to advise Rivka of the consequences of failing to terminate Rivka's pension plan; (5) failing to cause Rivka's pension plan to be terminated; and (6) failing to state that Sharon resides in New Jersey.

210.    As a direct and proximate result of Defendants' negligence, Plaintiff Flint, Dana Flint, Sharon, Rivka, and Mazowian suffered damages.

WHEREFORE, Plaintiff Flint respectfully requests a final judgment in its favor and against Defendants, jointly and severally, for damages, costs, prejudgment and post judgment interest at the maximum rate allowable by law, and such other and further relief as this Honorable Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 29th day of July, 2025.


Respectfully submitted,

### PRO SE PLAINTIFF

/s/ Alexander Flint
Alexander Flint